DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant, Chetankumar Pravin Patel ("Chetan"), appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.
 I {¶ 2} At approximately 5:30 p.m. on July 1, 2005, Chetan went to the Twinsburg police station and reported his wife, Sejal, missing. Chetan told officers that he hoped no one had "kidnapped and murdered" Sejal. According to Chetan and his family, Sejal had left for work earlier that morning in the family's Mercedes Benz, but never arrived. The family allegedly became concerned when Sejal failed to answer her cell phone and other extended family members indicated that they had not heard from her.
 {¶ 3} On the morning of July 2, 2005, Chetan telephoned the Twinsburg Police Department and notified officers that he had located the black Benz that Sejal had taken to work. Officer Brian Donato drove to the Chrysler Stamping Plant parking lot and found Chetan waiting *Page 2 
in his Nissan Pathfinder next to the Benz. Officer Donato inspected the Benz from its exterior, but the sun glare largely prevented him from seeing through the vehicle's tinted windows. When Officer Donato cupped his hands and peered through the Benz' rear cargo side passengers' window, however, he saw what appeared to be a rolled up blanket. He asked Chetan if he knew what the object might be. Chetan responded in the negative, but then became alarmed and exclaimed, "that's my wife!" Once other officers arrived, they opened the Benz' hatch and discovered Sejal's body wrapped in a blanket.
 {¶ 4} On June 18, 2007, the grand jury indicted Chetan on the following counts: aggravated murder, pursuant to R.C. 2903.01(A); tampering with the evidence, pursuant to R.C. 2921.12(A)(1); and abuse of a corpse, pursuant to R.C. 2927.01. The grand jury also indicted Minaxiben Patel ("Minaxi"), his mother, Rupal Patel, his lover, and Rupal's roommate, Vijaykumar Patel ("Vijay"), based on the theory that all of the aforementioned individuals conspired to murder Sejal. Before trial, both Rupal and Vijay entered into plea bargains and agreed to testify against Chetan and Minaxi. Chetan's and Minaxi's cases were consolidated for trial.
 {¶ 5} On October 29, 2007, the matter proceeded to a jury trial. Subsequently, the jury found Chetan guilty on all counts, and the trial court sentenced him to a total of thirty years to life in prison with the possibility of parole and five years of post-release control.
 {¶ 6} On January 3, 2008, Chetan filed his notice of appeal. Chetan's appeal is now before this Court and raises six assignments of error for our review, several of which we rearrange and consolidate for ease of analysis. *Page 3 
 II Assignment of Error Number One "THE COURT COMMITTED ERROR, PREJUDICIAL TO DEFENDANT-APPELLANT, BY PERMITTING THE STATE TO INTRODUCE THE TESTIMONY OF AN ATTORNEY THAT RUPAL PATEL, A TESTIFYING CO-DEFENDANT, HAD GIVEN A PRIOR CONSISTENT STATEMENT."
 Assignment of Error Number Two "IT WAS ERROR FOR THE COURT TO PERMIT THE TESTIMONY OF A PRIOR CONSISTENT STATEMENT UNDER EVID.R. 801(D)(1)(b), WHEN THE PRIOR STATEMENT IS NOT CONSISTENT WITH THE TRIAL TESTIMONY."
 {¶ 7} In his first assignment of error, Chetan argues that the trial court erred in allowing Attorney Joseph Gorman, Rupal's former counsel, to testify as to Rupal's prior statement because Rupal failed to make the statement before her motivation to fabricate it arose. In his second assignment of error, Chetan argues that the admission of Rupal's prior statement also was an error because she had given multiple prior statements with varying, inconsistent, versions of the events.
 {¶ 8} A trial court possesses broad discretion with respect to the admission of evidence. State v. Maurer (1984), 15 Ohio St.3d 239, 265. This includes the discretion to determine whether evidence constitutes hearsay and whether it is admissible or inadmissible hearsay. SeeState v. Dever (1992), 64 Ohio St.3d 401, 414; State v. Hand,107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 92-94; State v. Muttart, 116 Ohio St.3d 5,2007-Ohio-5267, at ¶ 56; State v. Hardison, 9th Dist. No. 23050,2007-Ohio-366, at ¶ 4-5; State v. Brown, 9th Dist. No. 04CA008510,2005-Ohio-2141, at ¶ 4-11; Prakash v. Copley Tp. Trustees, 9th Dist. No. 21057, 2003-Ohio-642, at ¶ 38-42. It further includes the discretion to determine whether to admit evidence of prior acts pursuant to Evid. R. 404(B). See State v. Basford, 9th Dist. No. 03CA0043-M, 2003-Ohio-5613, *Page 4 
at ¶ 4-6. An appellate court will not disturb evidentiary rulings absent an abuse of the trial court's discretion. State v. Roberts,156 Ohio App.3d 352, 2004-Ohio-962, at ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621.
 {¶ 9} Evid. R. 801(D)(1)(b) provides that a prior statement is not hearsay if all of the following elements apply:
 "The declarant testifies at trial * * * and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]"
The consistent statements that the offering party seeks to introduce in order to rehabilitate its witness must have been made "prior to the emergence of the improper influence or motive" to fall within the scope of Evid. R. 801(D)(1)(b). State v. Edwards (July 28, 1999), 9th Dist. No. 97CA006775, at *3.
 {¶ 10} Rupal testified at trial and was subject to cross-examination. Accordingly, the only issues remaining are whether Chetan accused her of fabricating her testimony and whether the rebuttal evidence that the State introduced came into existence before the emergence of the "improper influence or motive" that allegedly caused the fabrication. Id. Chetan does not disagree that his counsel questioned Rupal about the terms of her plea bargain and the "deal" she received in exchange for her testimony. Rather, he claims that none of Rupal's alleged "prior" consistent statements, as introduced through Attorney Joseph Gorman, came before her plea bargain offer. The record, however, reflects otherwise. *Page 5 
 {¶ 11} Attorney Gorman testified that he could not recall the exact date that the State offered Rupal her plea bargain, but did recall that he did not "have any assurances from the prosecutors * * * that [Rupal] would not be charged with murder" when he took her statement in September 2005. Rupal implicated Chetan in Sejal's murder in that same statement. Accordingly, the primary motivation for Rupal to fabricate her statement, the offer of an assured charge of murder instead of aggravated murder and a favorable letter from the State drafted to her parole board, came after Rupal implicated Chetan in Sejal's murder.
 {¶ 12} Next, Chetan argues that the trial court erred in permitting the State to introduce Rupal's prior "consistent" statements through Attorney Gorman because Rupal never gave a consistent version of the events. Specifically, Chetan argues that Rupal: (1) misstated the level of her involvement in Sejal's murder, even to the point of telling Attorney Gorman that she was not involved at all; (2) never mentioned the prior attempts on Sejal's life in her statements to Attorney Gorman; and (3) never told Attorney Gorman about the rope used to strangle Sejal.
 {¶ 13} Attorney Gorman frankly admitted during his testimony that he became frustrated with Rupal because she repeatedly varied the level of her involvement in Sejal's death. He stated that over the six to seven hour period that he interviewed Rupal in September 2005, "[s]he changed her story * * * during the day" and gave "little nuggets, more and more" as the day went on. He clarified, however, that the majority of the inconsistencies revolved around Rupal limiting her own involvement in the case, not the involvement of the others. The State sought to introduce Attorney Gorman's testimony to rebut the implication that Rupal had lied about Chetan's involvement in Sejal's murder. As previously noted, Attorney Gorman testified that Rupal implicated Chetan in her very first interview with him in September 2005. Consequently, even if Rupal's testimony was inconsistent with regard to her involvement in the case, we cannot *Page 6 
find that the trial court abused its discretion in determining that her prior statement was consistent with her trial testimony in that Chetan played a role in orchestrating Sejal's murder.
 {¶ 14} Moreover, Chetan has not shown prejudice as a result of the trial court admitting Attorney Gorman's testimony. Rupal admitted on cross-examination that she had repeatedly lied to the police during their investigation. Defense counsel was able to reiterate this point yet again through the testimony of Attorney Gorman, who freely admitted that Rupal failed to give one consistent story during their interview together. Thus, it would appear that the admission of Attorney Gorman's testimony impugned Rupal's credibility just as much as it restored it. Chetan's first and second assignments of error lack merit.
 Assignment of Error Number Five "THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO APPELLANT BY THE ADMISSION OF OTHER ACTS TESTIMONY."
 {¶ 15} In his fifth assignment of error, Chetan argues that the trial court erred in permitting the State to introduce other acts testimony. We disagree.
 {¶ 16} A trial court possesses broad discretion with respect to the admission of evidence. Maurer, 15 Ohio St.3d at 265. See, also,Basford at ¶ 4-6 (noting that abuse of discretion standard applies to admission of evidence regarding Evid. R. 404(B) testimony). An appellate court will not disturb evidentiary rulings absent an abuse of discretion. Roberts at ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore,5 Ohio St.3d at 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court.Pons, 66 Ohio St.3d at 621.
 {¶ 17} For other acts evidence to be admissible, "substantial evidence must prove that the other acts were committed by the defendant" and "the other acts evidence must fall within *Page 7 
one of the theories of admissibility enumerated in Evid. R. 404(B)."State v. Stephens, 9th Dist. No. 23845, 2008-Ohio-890, at ¶ 14, citingState v. Broom (1998), 40 Ohio St.3d 277, 282. "While the State generally cannot introduce other acts evidence to prove that a defendant possessed a certain character trait and acted in conformity therewith, Evid. R. 404(B) permits the State to introduce evidence of other crimes, wrongs, or acts in certain instances." State v. Clay, 9th Dist. No. 23889, 2008-Ohio-2158, at ¶ 29. Such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R. 404(B).
 {¶ 18} The record reflects that the State introduced two prior incidences of violence between Chetan and Sejal. Officer Greg Feketik of the Twinsburg Police Department testified that he reported to Chetan's home on April 1, 2002 for a domestic dispute based on an allegation that Chetan had slapped Sejal across the face. He specified that no arrests were made, however, because Sejal refused to press charges against Chetan and she had no visible injuries. Officer Terry Wain of the Twinsburg Police Department testified that he reported to Chetan's residence on May 1, 2005 for a domestic violence call. Officer Wain testified that Chetan denied hitting Sejal on this occasion and claimed that he was only having a dispute with his cousin, Tarunkumar ("Tarun") Patel. Yet, Tarun testified that he had gotten into a fight with Chetan only after he witnessed Chetan strike Sejal in the back of the head. Tarun also told officers that Chetan frequently hit Sejal for no reason.
 {¶ 19} Chetan failed to object to Tarun's retelling of the May 1, 2005 incident. Accordingly, he forfeited any objection to Tarun's testimony on appeal. State v. Payne, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 23. With regard to the May 1, 2005 incident, he argues that the trial court erred in admitting it because "the incident did not relate to Sejal[.]" Tarun's *Page 8 
testimony negates this argument, however, because Tarun explained that he and Chetan only started to argue as a result of Chetan hitting Sejal in the head before the police arrived. Consequently, the May 1, 2005 incident did involve Sejal and was admitted, without objection, through Tarun's testimony.
 {¶ 20} As to the April 1, 2002 incident, Chetan argues that the incident was "too remote in time" to qualify as admissible Evid. R. 404(B) evidence. Chetan cites no law in support of the proposition that the expiration of three years in between domestic violence incidents amounts to too long of a period of time. See App. R. 16(A)(7). Moreover, Tarun testified that Chetan frequently hit Sejal for no reason even apart from the two instances for which the police were called. This supports the conclusion that Chetan's conduct was not a single incident that should have been excluded as being "too remote in time[.]" Chetan's fifth assignment of error is overruled.
 Assignment of Error Number Four "IT WAS ERROR FOR THE COURT TO HAVE FAILED TO INSTRUCT THE JURY REGARDING THE LIMITED PURPOSES FOR WHICH OTHER ACTS TESTIMONY WAS RECEIVED."
 {¶ 21} In his fourth assignment of error, Chetan argues that the trial court erred in failing to instruct the jury as to the limited purpose of the State's other acts testimony. Specifically, he argues that the trial court should have instructed the jury that it could not consider two prior domestic violence incidents as evidence of Chetan's bad character.
 {¶ 22} The record reflects that Chetan never requested an instruction on the use of other acts evidence. Crim. R. 30(A) provides, in relevant part, as follows:
 "On appeal, a party may not assign as error the *x*x* failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury." *Page 9 
As Chetan failed to request a limiting instruction as to the other acts evidence at any point in time before the jury retired, he may not now claim error as to the trial court's failure to give the instruction.State v. Travis, 9th Dist. No. 06CA0075-M, 2007-Ohio-6683, at ¶ 30, citing State v. Ditzler (Mar. 28, 2001), 9th Dist. No. 00CA007604, at *5. Further, we need not consider whether the trial court committed plain error in failing to give the instruction because Chetan fails to argue plain error on appeal. See State v. Hairston, 9th Dist. No. 05CA008768, 2006-Ohio-4925, at ¶ 11 (providing that this Court will not sua sponte undertake a plain error analysis). Chetan's fourth assignment of error is overruled.
 Assignment of Error Number Three "DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONALLY PROTECTED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER STRICKLAND V. WASHINGTON (1984), 466 U.S. 688."
 {¶ 23} In his third assignment of error, Chetan argues that he was deprived of the effective assistance of counsel because his counsel failed to object to certain statements and failed to request various jury instructions. We disagree.
 {¶ 24} To prove an ineffective assistance claim, Chetan must show that: (1) counsel's performance was deficient to the extent that "counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment [,]" and (2) "the deficient performance prejudiced the defense." Strickland v. Washington (1984), 466 U.S. 668,687. To demonstrate prejudice, Chetan must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136, paragraph three of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. Furthermore, the Court need not *Page 10 
address both Strickland prongs if an appellant fails to prove either one. State v. Ray, 9th Dist. No. 22459, 2005-Ohio-4941, at ¶ 10.
 {¶ 25} First, Chetan argues that his counsel failed to enter a "specific constitutional objection" to the testimony of Detective Greg Kopinski when the Detective commented on Chetan's pre-arrest silence. Chetan claims that Detective Kopinski commented on his silence by testifying that Chetan had failed to respond to his requests for an interview. The record reflects that Chetan's counsel objected to the State's questions, but did not specifically state the grounds for his objection. In any event, it is unclear how Detective Kopinski's testimony prejudiced Chetan. Detective Kopinski testified that he interviewed Chetan on July 2, 2005, but then could not secure his attendance at a second interview. Detective Kopinski did not indicate that Chetan refused to attend or elaborate any further as to why no follow-up interview took place. Thus, the record does not support Chetan's argument that Detective Kopinski inappropriately commented on his silence.
 {¶ 26} Second, Chetan argues that his counsel failed to object when Detective James Scarl inappropriately indicated that Chetan had requested an attorney before speaking to police any further. He further argues that his counsel should have objected when Detecive Scarl "relate[d] his theories and beliefs about how and why the murder occurred." Yet, Chetan fails to point this Court to the allegedly inappropriate questions directed at Detective Scarl or to his responses. An appellant bears the burden of demonstrating error on appeal through citations to the record. See App. R. 16(A)(7). Because we have no way of knowing the questions or responses with which Chetan takes issue, we cannot determine whether Chetan's counsel failed to object to the same and/or whether an objection was necessary. As such, this argument lacks merit. *Page 11 
 {¶ 27} Third, Chetan argues that his counsel failed to state the basis of his objection to Attorney Gorman's testimony. We have already determined, however, that Chetan did not suffer prejudice as a result of Attorney Gorman's testimony. Consequently, his counsel's failure to state a specific objection did not amount to ineffective assistance.
 {¶ 28} Fourth, Chetan argues that his counsel failed to object to character attacks that the prosecutor made during his closing argument. Specifically, he argues that the prosecutor should not have been permitted to portray Chetan as a "wife abuser" and "adulterer" who married Sejal for her family's money. The record reflects, however, that several witnesses testified that Chetan had struck Sejal on occasion, that he had an affair with Rupal during his marriage, and that Sejal's family loaned him large sums of money once the two were married. Moreover, objections are "within the realm of trial tactics and [do] not establish ineffective assistance of counsel." State v. Taylor, 9th Dist. No. 01CA007945, 2002-Ohio-6992, at ¶ 76.
 {¶ 29} Fifth, Chetan argues that his counsel was ineffective for failing to request jury instructions on the limited use of the "two * * * domestic violence calls at the Patel residence[,]" the fact that the absence of motive can be considered, and the fact that inferences should be resolved in his favor if circumstances create "equal inferences" consistent with either a theory of guilt or innocence. Yet, "[t]rial counsel's decisions regarding jury instruction are matters of trial strategy that, even if debatable, do not constitute ineffective assistance of counsel." State v. Evans, 9th Dist. No. 07CA009274,2008-Ohio-4295, at ¶ 55. The record evinces that the trial court instructed the jury that it must find each element of each crime satisfied beyond a reasonable doubt. Chetan makes no attempt to explain how he was prejudiced by the absence of these instructions, and the record is devoid of any such evidence of prejudice on this basis. As such, his argument lacks merit. *Page 12 
 {¶ 30} Lastly, Chetan argues that the cumulative effect of trial counsel's "numerous harmless errors" deprived him of the effective assistance of counsel. See State v. DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. As we have not found numerous instances of harmless error, Chetan's argument fails. Chetan's third assignment of error is overruled.
 Assignment of Error Number Six "THE JURY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 31} In his sixth assignment of error, Chetan argues that his convictions for aggravated murder, tampering with the evidence, and abuse of a corpse are against the manifest weight of the evidence. We disagree.
 {¶ 32} When considering a manifest weight argument, the Court:
 "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v.Martin (1983), 20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340. *Page 13 
 {¶ 33} Aggravated murder is defined in R.C. 2903.01(A), which reads in pertinent part: "No person shall purposely, and with prior calculation and design, cause the death of another[.]" "[T]he phrase `prior calculation and design' * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." State v. Taylor (1997), 78 Ohio St.3d 15, 19. "Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation." Taylor v.Mitchell (N.D.Ohio 2003), 296 F.Supp.2d 784, 820. "While a few fleeting moments of deliberation or instantaneous deliberations are inadequate to support prior calculation and design, `a prolonged period of deliberation is [also] unnecessary.'" Hairston at ¶ 80, quotingState v. Quinones (Oct. 14, 1982), 8th Dist. No. 44463, at *11;State v. Cotton (1978), 56 Ohio St.2d 8, paragraph two of the syllabus.
 {¶ 34} R.C. 2921.12(A)(1) provides, in part, that:
 "No person, knowing that an official proceeding or investigation * * * is about to be or is likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"
R.C. 2901.22(A) defines the mens rea of "purposely" as follows:
 "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
In determining whether a defendant acted purposely, "[a] defendant's state of mind may be inferred from the totality of the surrounding circumstances." State v. Sullivan, 9th Dist. No. 07CA0076-M,2008-Ohio-2390, at ¶ 10, citing State v. Harper (Mar. 29, 2000), 9th Dist. No. 19632, at *2. *Page 14 
 {¶ 35} Finally, R.C. 2927.01(B) provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." Anyone who violates this section is guilty of felony abuse of a corpse. R.C. 2927.01(C).
 {¶ 36} Chetan argues that his convictions must be reversed because: (1) they rested upon circumstantial evidence and the unreliable testimony of Vijay and Rupal, both of whom lied excessively during the investigation, and (2) he had no motive to kill Sejal. We find, however, that the record supports each of Chetan's convictions.
 {¶ 37} Twinsburg Police Department Officer Greg Feketik testified that he came to Chetan's home on both April 1, 2002 and May 1, 2005 based on reports of a domestic dispute. As to the first incident, Officer Feketik did not arrest Chetan because Sejal refused to press charges and had no visible injuries in spite of allegations that Chetan had slapped her. As to the second incident, Officer Feketik confirmed that he arrested Chetan after Tarun, Chetan's cousin, informed him that Chetan had struck Sejal and had gotten into an altercation with Tarun as a result. Officer Feketik clarified on cross-examination that the arrest led to a conviction, but only for disorderly conduct arising out of Chetan's fight with Tarun.
 {¶ 38} Officer Terry Wain also testified that he reported to Chetan's home on May 1, 2005. Officer Wain witnessed Chetan physically fighting with Tarun when he arrived on the scene, but the two stopped before he approached them. When Officer Wain interviewed Chetan about his involvement, however, Chetan denied having had any physical altercation with Tarun. Chetan also denied that Sejal had been involved in the fight. Tarun directly contradicted these assertions during his testimony. Tarun admitted that he and Chetan had gotten into a fight on May 1, 2005 because he witnessed Chetan hit Sejal in the back of her head. Tarun testified that Chetan frequently hit Sejal for no reason. *Page 15 
 {¶ 39} Twinsburg Police Department Officer Darrin Fate testified that Chetan came to the police station at approximately 5:32 p.m. on July 1, 2005 to report Sejal missing. Chetan told Officer Fate that Sejal had left for work earlier that same morning in his black Benz, but never showed up. In his written statement, Chetan reported to Officer Fate that his mother, Minaxi, had been at home when Sejal left for work. When Chetan telephoned Minaxi in search of Sejal, she told him that Sejal had left sometime around 10:00 a.m. and had taken lunch for everyone at work. Chetan also called "everybody" that he and Sejal knew in an attempt to locate her. Officer Fate indicated that Chetan appeared to be very upset while speaking with him and yelled that he hoped that no one had "kidnapped and murdered his wife." At this point, Sejal had been gone for approximately seven and a half hours.
 {¶ 40} Officers James Tobak and Brian Donato both testified that they reported to the Chrysler Stamping Plant parking lot the afternoon of July 2, 2005 after receiving word that Chetan had found the Benz that Sejal allegedly had driven to work the previous day. Officer Donato testified that after reviewing the surveillance tapes from the parking lot, he estimated that the Benz had been placed in the parking lot at approximately 10:18 a.m. on the morning of July 1, 2005.
 {¶ 41} Lata Patel, Sejal's mother, testified that Chetan married her daughter through an arranged marriage, but that she never approved of the marriage. Lata's husband, Sejal's father, loaned Chetan approximately $126,000 when the two married and another $100,000 later on in the marriage so that Chetan could purchase a business. Lata testified that once before her murder Sejal disappeared from home without telling Chetan where she was going. Chetan did not call Lata to ask her if Sejal might be with her until two days after her disappearance. When Sejal "disappeared" on the day of her murder, however, Chetan called Lata about two to three times *Page 16 
that same day to ask if she had heard from Sejal. Lata testified that she and Sejal had made plans for Sejal and her two children to visit Lata that same weekend and stay for several days. Yet, Sejal never arrived, and Lata soon learned that her daughter had been murdered. At the time of Sejal's death, Lata estimated that Chetan still owed her and her husband approximately $88,000 on the loan that they had given him to buy his business.
 {¶ 42} Twinsburg Police Officer Brian Donato testified that dispatch sent him to the Chrysler Stamping Plant parking lot on the morning of July 2, 2005 after Chetan informed officers that he had found the Benz that Sejal allegedly left for work in the previous morning. When Officer Donato arrived he saw the Benz parked in the corner of the lot against a wall and Chetan's Pathfinder parked alongside the Benz with Chetan still in the driver's seat. Chetan indicated that he had not approached the Benz while waiting for Officer Donato to arrive. He stated that he had gone to Fun n' Stuff in another attempt to locate Sejal because she had made plans to take the kids there that day. He further stated that he happened to see and recognize the Benz in the Chrysler parking lot on his drive back home. Chetan made no mention of how Sejal planned to visit her mother (who lived in Chicago) the same day that she was allegedly planning to take the children to Fun n' Stuff.
 {¶ 43} Officer Donato testified that Chetan then stepped out of his vehicle and the two approached the Benz. Officer Donato looked through the vehicle's front window and opened the driver's side door after failing to see anyone in the vehicle. Still failing to see anything, Officer Donato walked to the back of the Benz and peered through the rear windows. The sun glared against the windows, however, and made it difficult to see inside. Officer Donato then cupped his hands and placed them against the rear cargo side window. He saw what appeared to be a "rolled up blanket or carpet," so he asked Chetan if he knew what the object was. Chetan *Page 17 
initially stated that he did not, but then yelled "[t]hat's my wife!" Chetan then became hysterical and Officer Donato did his best to restrain him until another officer arrived.
 {¶ 44} Officer James Tobek arrived on the scene shortly after 12:30 p.m. He too had difficulty seeing inside the Benz' windows because of the sun glare, but he decided to open the Benz' rear hatch once he cupped his hands near the glass and saw a "rolled object" in the vehicle. Officer Tobek discovered Sejal's body, wrapped in a blanket, inside of the vehicle. The police estimated from surveillance tapes in the Chrysler Stamping Plant parking lot that the Benz had been placed in the lot at about 10:18 a.m. on July 1, 2005.
 {¶ 45} Dr. George Sterbenz, the Chief Deputy Medical Examiner for Summit County, testified that he examined Sejal's body and performed her autopsy. Dr. Sterbenz noted that Sejal was fully clothed when the police found her, but did not have on any shoes or socks. He further noted that Sejal had bruising on her left leg, marks on her neck, several blunt force injuries to her face and scalp, and petechia of the face. Dr. Sterbenz opined that Sejal died from a combination of manual and ligature strangulation over the course of several minutes. That is, she died from a stoppage in blood flow to the brain due to force being applied to her neck by someone's hands and by an object. Dr. Sterbenz found a green string or thread in one of the folds of Sejal's neck. Although he could not pinpoint Sejal's time of death because of the hot temperatures in the Benz where she was found, Dr. Sterbenz did note that he found money in Sejal's pockets when he removed her clothing and that she still had a necklace around her neck.
 {¶ 46} Apart from testifying about Chetan's prior incidents of domestic violence, Tarun Patel testified about the time that he spent living at Chetan's house. Tarun testified that Sejal had small quarrels with Chetan's mother, Minaxi, once she moved into their home. Tarun attempted to downplay the amount of fighting that Chetan and Sejal engaged in during their marriage, *Page 18 
stating that they only had the typical, small fights that most married people had. Tarun admitted, however, that he told officers that Chetan "would hit [Sejal] for no reason and boss her around[.]" Tarun also acknowledged a prior occasion when Sejal had left for about two days without telling Chetan of her whereabouts. Tarun stated that he was not aware of Chetan having called the police to search for Sejal on this prior occasion. He also stated that, at the time of Sejal's disappearance, Chetan and Rupal had been having an affair and Chetan owed Tarun approximately $50,000.
 {¶ 47} Chirag Patel, a friend of Chetan's family and a co-owner of one of Chetan's restaurants, testified that he arrived at work on July 1, 2005 at approximately 10:20 a.m. He stated that Chetan was already there when he arrived, but that Sejal never showed up. Chetan left the store sometime in the afternoon to speak with the police and to look for Sejal, but returned around 9:30 p.m. Chirag stated that Chetan was drunk when he returned to the store. Chetan appeared to be very upset and wanted to know if he would have to go back to India and get married again. Once they were ready to leave the store, Chirag followed Chetan's car back to Chetan's house. Chirag testified that on the way home, Chetan stopped at the intersection of Route 82 and Chamberlin Road, one corner of which is occupied by the Chrysler Stamping Plant parking lot. Chirag stated that Chetan's vehicle remained stopped at the intersection for a full minute before Chetan resumed driving again. When Chirag arrived at Chetan's house he entered through the garage. As he passed through the garage, Chirag saw that both pairs of Sejal's shoes were still in the garage.
 {¶ 48} Chirag also testified that he spoke with Chetan on the day that Chetan discovered that Rupal had been arrested regarding Sejal's death. Chirag knew that Chetan and Rupal had been having an affair, so he asked Chetan about Rupal's arrest. Chetan then began to cry. When *Page 19 
Chirag asked Chetan why he was crying, he said that "Rupal is going to say something to police about me. I'm done if Rupal says something. The police are not going to listen to me."
 {¶ 49} Vijay testified against Chetan after pleading guilty to the aggravated murder of Sejal. Vijay testified that he had engaged in an affair with Minaxi, Chetan's mother, while the two still lived in India. After Minaxi moved to the United States and began to live with Chetan and new daughter-in-law, she frequently spoke poorly of Sejal and told Vijay that she wanted to kill Sejal. Chetan also expressed a desire to kill Sejal. According to Vijay, Minaxi and Chetan attempted to have Sejal killed on three occasions before July 1, 2005. He indicated that Minaxi arranged to have his debts paid off upon his coming to the United States on the condition that he do whatever she asked.
 {¶ 50} Vijay testified that the following series of events took place regarding Sejal's murder. On the night of June 30, 2005, Minaxi called Vijay and Rupal, his roommate and Chetan's lover, at their residence and told them to be over Chetan's house in the morning. When the two arrived the next morning, Minaxi came out to the car and brought Vijay inside while indicating that Rupal should leave and return with the car in about half an hour. Vijay entered the house with Minaxi, and she gave him gloves to wear. Although Vijay told Minaxi that he did not wish to be involved, Minaxi threatened Vijay and his family, telling him that it would be easy to have him deported or killed or to pay someone in India to kill his family. Consequently, Vijay reluctantly went along with the murder.
 {¶ 51} As Vijay entered the room where Sejal was, he observed Chetan sitting on the sofa with Sejal's head on his lap. Chetan had a rope around Sejal's neck and was using it to strangle her. Chetan's father, Pravin Patel, held down Sejal's legs on the opposite end of the couch. Minaxi repeatedly struck Sejal in the leg while she was being strangled. Chetan also *Page 20 
made Vijay hold onto the rope and help to strangle Sejal. During her murder, Sejal wore an old, faded blue t-shirt and black leggings. Once the murder was accomplished, Minaxi and Chetan changed Sejal into her work uniform, and the family carried her body out to the Benz. Minaxi gave Vijay $10,000 in cash and told him that he and Rupal had to drive Sejal's body to the Chrysler Stamping Plant parking lot. By then, Rupal had returned, and the family permitted her to take Vijay for some coffee before coming back to dispose of Sejal's body.
 {¶ 52} Once in the car, Rupal and Vijay traveled to the local Speedway gas station. Vijay told Rupal that he had helped to kill Sejal, and the two discussed fleeing the area. Both Vijay and Rupal attempted to call Chetan's home to tell him and Minaxi that they were not coming back, but they could not establish a connection from the gas station phone. The two returned to Chetan's house. Once again, Minaxi threatened them and their families, so they agreed to go forward with the plan. Minaxi handed Vijay a bag containing the clothing Sejal had on during the murder, her cell phone, the rope used to strangle her, and the gloves that the family had worn to murder her. Minaxi told Vijay that she had "cleaned the house * * * [and] gathered up all the clothes * * *, so there's no chances of us getting arrested. * * * [T]hey will feel that she was going to the store and somebody must have killed her on the way there and they must have left her there." She then instructed Vijay to go somewhere else after disposing of the body and to discard the items. Rupal drove the Benz to the Chrysler parking lot while Vijay followed behind her. After leaving the body, Rupal and Vijay drove away. During the drive, Vijay threw separate pieces of the evidence Minaxi gave him along the side of the road.
 {¶ 53} During her testimony, Rupal testified to the following series of events regarding Sejal's murder. Rupal and Chetan had a relationship in India before moving to the United States and continued to have a sexual relationship in the United States after he married Sejal. Both *Page 21 
Chetan and Minaxi frequently complained about Sejal, who had married Chetan through an arranged marriage. Subsequently, both Chetan and Minaxi expressed a desire to kill Sejal, and Chetan told Rupal that she must come to his house on the morning of July 1, 2005 to carry out Sejal's murder. Rupal expressed the same version of events as Vijay with the exception of the details of Sejal's actual murder, which took place after Rupal dropped Vijay at the house and before she returned. Rupal indicated that Minaxi became nervous after Rupal and Vijay finished dropping Sejal's body off at the Chrysler parking lot because they had forgotten to put Sejal's lunch in the car with her and to put her socks and shoes on her feet.
 {¶ 54} Chetan argues that his convictions are against the manifest weight of the evidence because they are based on circumstantial evidence. Yet, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value[.]" State v. Jenks (1991),61 Ohio St.3d 259, paragraph one of the syllabus. The fact that the State relied heavily upon circumstantial evidence to prove Chetan's guilt does not weigh against his convictions. Nor does the presence or absence of a motive on Chetan's part. "Motive is not an element of the crime of homicide required to be established to warrant a conviction." Fabian v.State (1918), 97 Ohio St. 184, 189. Even so, the record supports the suggestion that Chetan had motive to murder Sejal either because he owed a substantial sum of money to her family or because of his desire to be with Rupal instead of Sejal. Chetan's argument that the record is devoid of a motive lacks merit.
 {¶ 55} Finally, Chetan argues that this Court should reverse his convictions because they rested solely upon the testimony of Vijay and Rupal, both of whom lied during the entire course of the investigation and testified against him solely to ensure their own favorable plea bargains. Initially, we note that both Vijay and Rupal disclosed the full terms of their plea agreements to the jury and admitted to the numerous inconsistencies in their statements. The jury had the *Page 22 
ability to decide whether or not to believe Vijay when he stated that he lied because he feared that Chetan and Minaxi would exact revenge upon either him or his family for his cooperation with the police. The jury also had the ability to consider Rupal's explanation that she was untruthful because she also feared retribution and because she sought to protect her lover, Chetan, at first. We cannot find that the jury erred in convicting Chetan simply because the jurors found Vijay and Rupal to be credible.
 {¶ 56} Additionally, other evidence in the record supported Vijay's and Rupal's testimony. Detective Scarl testified that the evidence supported the theory that Sejal's family, not a stranger, was responsible for her murder. The evidence comports with this theory because police found money in Sejal's pockets and a necklace on her neck, suggesting that she was not the victim of a robbery or theft crime. Further, the police estimated that the Benz containing Sejal's body was placed at the Chrysler Stamping Plant parking lot by approximately 10:18 a.m. on the morning of July 1st; only half an hour after Minaxi claimed that Sejal had left home for work. When the police found Sejal's body, she did not have any socks or shoes on her feet. Both pairs of her shoes had been left in the garage at home. Tarun testified that typical Indian custom forbids the wearing shoes inside of the home, thereby suggesting that Sejal was killed in her traditional Indian home before she put on her shoes to leave for work. Sejal had bruising on her legs and ligature marks on her necks. These injuries comport with Vijay's testimony that Minaxi beat Sejal's legs while Chetan strangled her with a rope. Finally, by his own statement, Chetan expressed concern that Rupal would turn him over to the police for his involvement and that, if she did so, he would be "done" because the police would not listen to him. Given all the evidence in the record, we cannot say that Chetan's convictions are against the weight of the evidence. Chetan's sixth assignment of error lacks merit. *Page 23 
 III {¶ 57} Chetan's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
SLABY, P. J. CONCURS