OPINION
{¶ 1} Appellant, Jason Airwyke ("Airwyke"), appeals from the judgment entry of the Trumbull County Court of Common Pleas. On review, we affirm the judgment of the trial court insofar as it pertains to Airwyke's convictions, but reverse for correction of clerical errors. *Page 2 
 {¶ 2} Statement of Facts and Procedural History
 {¶ 3} Airwyke and his friend, James Taylor ("Taylor"), were customers at the Villa Madrid Tavern in Warren, Ohio, on the night of November 5, 2004. While there, they each consumed between eight and twelve beers as well as eight to twelve shots of whiskey. Taylor and another customer, Jeff Smith, also known as "Smitty," had a verbal confrontation in the bar. All of them remained in the bar until sometime after 5:00 a.m. the next morning, when Smitty left the bar. Airwyke and Taylor exited the bar to the parking lot shortly thereafter. In the parking lot Taylor asked Smitty why he had referred to him and Airwyke as "asshole buddies." Airwyke then got between Taylor and Smitty and asked him the same thing. The next thing Taylor heard was a pop, and the next thing he saw was Smitty lying unconscious on the ground between two vehicles. Another witness, Michael Rosier ("Rosier"), who was sitting in a nearby pickup truck, actually saw Airwyke punch Smitty, saw that the punch lifted Smitty off the ground, and saw his head hit the pavement. The paramedics were able to restart his breathing, but the coroner later testified that he was brain dead after his head hit the pavement. He died a few hours later.
 {¶ 4} Airwyke was arrested at approximately 9:00 a.m. the same day. He gave a statement to the police in which he admitted striking Smitty in the face. Airwyke was originally charged with felonious assault. He was later indicted for felonious assault, a violation of R.C. 2903.11(A), a second-degree felony, and involuntary manslaughter, a violation of R.C.2903.04(A), a first-degree felony. A not guilty plea was entered. The case proceeded to a jury trial on April 10, 2006. Airwyke was found guilty of a lesser involuntary manslaughter charge, pursuant to R.C.2903.04(B), a third-degree felony, *Page 3 
and a lesser misdemeanor assault charge, pursuant to R.C. 2903.13. The difference between the two charges of involuntary manslaughter is that the more serious charge requires the commission of a felony in connection with the victim's death, whereas the less serious charge requires the commission of a misdemeanor.
 {¶ 5} Airwyke was sentenced on May 17, 2006, to one year on the felony conviction and six months for the misdemeanor conviction, such sentences to run concurrently. The execution of Airwyke's sentence has been stayed by this court pending the outcome of this appeal.
 {¶ 6} Airwyke filed a timely appeal to this court, raising five assignments of error. The first assignment of error is as follows:
 {¶ 7} "The trial court erred, to the prejudice of the appellant, by excluding a portion of the testimony of James Cornell ("Cornell") and a written report from this witness concerning whether or not the victim was ambulatory after he was struck by the appellant."
 {¶ 8} Evid.R. 803(4) Hearsay Exception — Statement for Purposes ofMedical Diagnosis or Treatment
 {¶ 9} In this assignment of error, Airwyke is challenging the evidentiary ruling of the trial court that prohibited his counsel from inquiring concerning a portion of an emergency run report. The subject portion of the run report made reference to a bystander statement that Smitty was ambulatory after he was struck.
 {¶ 10} Cornell was one of two ambulance personnel who responded to the scene at the Villa Madrid at 5:29 a.m. On cross-examination by Airwyke's counsel, Cornell was asked about a narrative summary that Cornell had incorporated into the "patient *Page 4 
history" section of the emergency run report. The run report was identified as defense Exhibit B. Cornell had already testified that there were approximately six people in the vicinity of the scene in the parking lot.
 {¶ 11} The following colloquy occurred between defense counsel and Cornell:
 {¶ 12} "[Attorney:] At that point, did you immediately start tending to Mr. Smith, or did you have discussions with the people who were around?
 {¶ 13} "[Cornell:] Simultaneously.
 {¶ 14} "[Attorney:] All right. So as you were tending to Mr. Smith, you were asking questions that you felt were relevant to Mr. Smith's medical treatment, care and diagnosis, correct?
 {¶ 15} "[Cornell:] Yes."
 {¶ 16} Through this line of inquiry, Airwyke was attempting to get into evidence the following portion of the narrative summary in Exhibit B that contained a report from one of the bystanders: "[p]er bystanders, [Smith] was at bar and was punched in the face. Patient walked around a bit and fell down in parking lot. Patient then went unresponsive." Airwyke was attempting to introduce doubt as to the exact cause of Smith's death. That is, instead of Smith falling and hitting his head on the pavement as the result of the punch by Airwyke, such evidence would be probative of some other cause, for example, that he fell and hit his head because his blood-alcohol level was .33 and he was, therefore, highly intoxicated.
 {¶ 17} Following the above colloquy, and before Cornell was allowed to testify about the notation in the run report, a discussion was had outside the presence of the jury, at the prosecutor's request. Airwyke argued to the trial court that he was seeking *Page 5 
to gain admission of the subject notation via Evid.R. 803(4), that permits such statements to be admitted where they are in furtherance of medical diagnosis or treatment. The prosecutor responded that it was inadmissible hearsay. The trial court ruled that the notation was inadmissible hearsay and, absent the identity of the declarant, which would then give Airwyke the ability to have that person testify, Airwyke would not be permitted to pursue this line of inquiry. Cornell was unable to identify the declarant of the statement. The court later admitted Exhibit B into evidence, but redacted the quoted notation for the jury's review. Airwyke's counsel objected to the redaction of the quoted notation from Exhibit B.
 {¶ 18} "Evidentiary rulings are within the sound discretion of the trial court: we may not disturb them absent a clear abuse of that discretion. * * * Abuse of discretion is not mere error of law or judgment. Rather, it connotes that the attitude of the trial court was unreasonable, arbitrary, or unconscionable." State v. Cochran, 11th Dist. No. 2006-G-2697, 2007-Ohio-345, at ¶ 16, citations omitted.
 {¶ 19} Evid.R. 803(4) permits the admission of statements made for the purpose of medical diagnosis or treatment, as follows:
 {¶ 20} "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
 {¶ 21} "[T]he Rule does not require that such a statement be made either by a patient or to the physician as Rule 803(4) encompasses statements made by persons who bring the patient to the hospital or doctor's office, as long as the third person's *Page 6 
statements are in subjective contemplation of treatment or diagnosis." Weissenberger's Ohio Evidence (2005) 488-489, Section 803.49. Ordinarily, of course, the statements are "made by the patient for purposes of medical diagnosis or treatment, * * * [and] are admissible only where they are * * * `reasonably pertinent to such diagnosis or treatment.'" State v. Boston (1989), 46 Ohio St.3d 108, 121. "The Staff note to Evid.R. 803(4) states that this hearsay exception rule "should not be a conduit through which matters of no medical significance would be admitted," and further that "[t]he circumstantial guaranty of trustworthiness of this exception is derived from the assumption that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements."
 {¶ 22} We conclude that the statement of the bystander to Cornell is not inherently trustworthy. There is nothing to indicate that it was made in contemplation of medical treatment or diagnosis or treatment, even though it was made to a paramedic. It was simply the declaration of an unknown bystander that Smitty may have been walking around after Airwyke hit him. There is nothing in the statement itself that necessarily is related to diagnosis or treatment, nor does the statement suggest that the declarant was concerned about diagnosis or treatment. Thus, the statement is lacking the element of reliability. Even if one were to conclude that the statement could have medical significance, if true, one can only speculate that such significance was known to the declarant. Lacking the declarant's identity, the trial court chose not to permit questioning that would elicit testimony regarding the content of the bystander's statement. The trial court did not abuse its discretion in this regard. *Page 7 
 {¶ 23} Evid.R. 803(6) Hearsay Exception — Records of RegularlyConducted Activity
 {¶ 24} Alternatively, Airwyke argues that, even if the statement was not admissible as an exception to the hearsay rule under Evid.R. 803(4), it was admissible as a record of a regularly conducted activity pursuant to Evid.R. 803(6), which provides, in pertinent part, as follows:
 {¶ 25} "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."
 {¶ 26} This alternative argument suffers from the same infirmity as the argument under Evid.R. 803(4), namely, that the bystander statement is not inherently trustworthy. We have already stated reasons why the statement is not trustworthy as a statement in furtherance of medical diagnosis or treatment. The statement has no more trustworthiness as a statement or record of a regularly conducted activity. For that reason, the statement was not admissible pursuant to Evid.R. 803(6).
 {¶ 27} At oral argument, Airwyke's counsel further pressed his argument regarding the possibility of Smitty being ambulatory after the punch by Airwyke, and that the redacted portion of Exhibit B should have been admitted by the trial court. His *Page 8 
argument is unpersuasive in light of our analysis above, that the statement is inadmissible hearsay. In addition, we note that no other witness was asked if Smitty got up and walked around after he was punched. For example, Cornell, the ambulance driver, testified immediately after Rosier, the eyewitness to the incident. Airwyke's counsel had the run report containing the hearsay statement at least twelve days prior to trial, yet Rosier was not asked if Smitty walked around after he was punched. Nor were the two investigating detectives, who testified after Cornell, asked whether they were able to determine if Smitty was ambulatory after he was punched. If the argument had any real merit, it follows that Rosier, the only eyewitness to the punch, would have been asked whether Smitty got up and walked around after he was punched by Airwyke. If Rosier had seen Airwyke punch Smitty, then he would have seen Smitty get up and walk around as well. The fact that he was not asked this question further confirms the lack of trustworthiness of the statement supposedly made by a bystander. Thus, the trial court did not abuse its discretion in keeping the hearsay statement away from the jury.
 {¶ 28} The first assignment of error is without merit.
 {¶ 29} Airwyke's second assignment of error is as follows:
 {¶ 30} "The trial court erred and abused its discretion, to the prejudice of the appellant, by excluding testimony concerning why one of the appellee's witnesses had been arrested as a `material witness.'"
 {¶ 31} Limiting Cross-Examination
 {¶ 32} In this assignment of error, Airwyke is arguing that the trial court erroneously prohibited him from further cross-examination of Detective Hoolihan *Page 9 
concerning the circumstances surrounding the arrest of another witness, Michael Rosier, on a material witness warrant. Detective Hoolihan was the lead investigator in the case.
 {¶ 33} The trial court is vested with the discretion to limit the scope of cross-examination, depending on the facts of the particular case. State v. Treesh (2001), 90 Ohio St.3d 460, 480-481. "`Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion.'" Id. (citation omitted).
 {¶ 34} Rosier was arrested pursuant to an order for recognizance issued by the trial court on April 5, 2006. The order was issued pursuant to R.C. 2941.48 and 2937.18. By the terms of the order, Rosier was ordered to testify at Airwyke's trial on April 10, 2006.
 {¶ 35} At the point in the trial when Airwyke's counsel was cross-examining Detective Hoolihan, Rosier had already testified and, according to Airwyke, had changed his testimony from that of his prior statement to the police. Rosier was not cross-examined as to whether he was intimidated by his arrest as a material witness, though he was asked about inconsistencies between his in-court testimony and his original statement to the police.
 {¶ 36} Airwyke asserts that Rosier changed his testimony because he was intimidated to do so by the fact of being arrested on a material witness warrant. It is not clear from the record as to whether Airwyke was arguing that James Taylor was attempting to intimidate Rosier, or whether an agent of the state was intimidating him. In either event, Airwyke was arguing that the fact of being arrested on a material *Page 10 
witness warrant caused Rosier to change his statement to accommodate the state's case.
 {¶ 37} As stated by Airwyke in his brief: "the question of why [Rosier] had actually been arrested and held for trial as a `material witness' is quite pertinent to the question of whether or not [Rosier] had actually been or felt coerced to testify in favor of [the state of Ohio's] theory of the case."
 {¶ 38} Even if the question as to why Rosier had been arrested and held as a material witness was a proper question, the further question is: why ask this question of Hoolihan, and not Rosier himself? After all, Rosier is the one to testify as to whether he was coerced to testify. In effect, Airwyke is attempting to impeach Rosier's testimony by eliciting testimony from Hoolihan bearing on whether Rosier was telling the truth when he testified. However, he laid no foundation in Rosier's testimony for the fact that Rosier was intimidated or coerced to testify, nor did he otherwise make a prima facie showing that intimidation had taken place. Why, then, should the trial court permit Airwyke to cross-examine another witness about a previous witness' feeling of intimidation when there has been no showing of intimidation from that previous witness' testimony? Notably, Airwyke has offered no authority for his position on this issue.
 {¶ 39} We conclude that cross-examination on the subject of Rosier's intimidation, if any, and his "motive to misrepresent" his testimony, was impeachment material that Airwyke should have delved into in Rosier's cross-examination pursuant to Evid.R. 616(A). We do not agree that the question was a proper question to ask of Detective Hoolihan and conclude that the trial court correctly limited Airwyke in his cross-examination of Hoolihan. The trial court did not abuse its discretion in this regard. *Page 11 
 {¶ 40} The second assignment of error is without merit.
 {¶ 41} Airwyke's third assignment of error is as follows:
 {¶ 42} "The appellant's conviction for involuntary manslaughter was not supported by sufficient evidence."
 {¶ 43} Involuntary Manslaughter — Sufficiency of Evidence
 {¶ 44} "Sufficiency is a question of law dealing with adequacy of the evidence." State v. Thompkins, 78 Ohio St.3d 380, 386. "In evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the state and determine whether reasonable minds can reach different conclusions as to whether each element has been proven beyond a reasonable doubt. State v. Goff (1998), 82 Ohio St.3d 123, 128."State v. Donkers, 11th Dist. Nos. 2003-P-0135, 2003-P-0136,2007-Ohio-1557, at
 {¶ 45} Airwyke concedes that the evidence was sufficient for his assault conviction, but argues that the evidence was lacking a "causal link" for his conviction for involuntary manslaughter. We disagree.
 {¶ 46} R.C. 2903.04(B) provides, in pertinent part, as follows:
 {¶ 47} "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree[.]"
 {¶ 48} In the opinion of the coroner who testified, to "a reasonable degree of medical certainty, death was caused by respiratory failure secondary to cerebral [cortical] contusions that are due to blunt impact of the head." That is, Smitty's death was caused by a blunt impact to the back of the head, which caused contusions to his brain, making his brain swell, which, in turn, made him unable to breathe. Thus, it was *Page 12 
Smitty's head striking the pavement which resulted in Smitty's death, and not the punch to the face.
 {¶ 49} With regard to causation, the trial court instructed the jury as follows: "[c]ause is an act, which in a natural and continuous sequence directly produces the death of Jeff Smith without which it would not have occurred."
 {¶ 50} With regard to criminal responsibility for the act, the trial court instructed:
 {¶ 51} "[Airwyke's] responsibility is not limited to the immediate or most obvious result of [Airwyke's] act. [Airwyke] is also responsible for the natural, foreseeable consequences that follow in the ordinary course of events from that act. There may be one or more causes of an event, however, if [Airwyke's] act, or failure to act, was one cause, then the existence of other causes is not a defense."
 {¶ 52} Rosier testified that he saw Airwyke punch Smitty in the face, that the punch lifted Smitty off the ground, and that he saw Smitty's head hit the pavement. Airwyke admitted that he punched Smitty in the face in his statement to the police. The coroner testified that it was the fall of the head on the pavement that led to Smitty's death. There was no evidence to refute the sequence of events that led to Smitty's death. When the jury applied the trial court's jury instructions on causation and criminal responsibility to the testimony adduced at trial, it reasonably concluded that Airwyke was guilty of involuntary manslaughter. We conclude that there was sufficient evidence for the jury to so find.
 {¶ 53} The third assignment of error is without merit.
 {¶ 54} Airwyke's fourth assignment of error is as follows: *Page 13 
 {¶ 55} "The Appellant's conviction for involuntary manslaughter is against the manifest weight of the evidence."
 {¶ 56} Involuntary Manslaughter — Weight of the Evidence
 {¶ 57} "The [appellate] court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 58} Thus, the Supreme Court of Ohio has directed reviewing courts to reverse a conviction on the ground of manifest weight of the evidence only where there is a "manifest miscarriage of justice" and where the jury "clearly lost its way." Also, the weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 59} "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 81.
 {¶ 60} To support his manifest weight argument, Airwyke cites to testimony from various witnesses for the proposition that the jury verdict was "impossible and illogical." *Page 14 
For example, the bar maid testified that Taylor and Smitty were confrontational inside the bar and that when she went out to the parking lot immediately after the incident, she saw Taylor, not Airwyke, standing over Smitty. She also testified that Taylor told her, "I only knocked him out" and that Taylor threatened her if she did not keep her mouth shut about what she saw. She also thought she saw boot prints on Smitty's chest.
 {¶ 61} Airwyke then refers to Taylor's testimony. Taylor testified that he did not see the punch that was thrown by Airwyke, he only heard a "pop"; that Airwyke struck the victim only one time; and he denied kicking, stomping, or spitting on Smitty's body. He also denied that he told the bar maid that he only knocked out Smitty.
 {¶ 62} Airwyke then turns to the coroner's testimony. As stated above, the coroner testified that it was the fall on the back of the head on the pavement that caused Smitty's death. However, the coroner also testified that Smitty sustained multiple abrasions and lacerations from his forehead to his chin.
 {¶ 63} Airwyke posits that all these injuries could not have been caused by a single punch. In all likelihood, argues Airwyke, they were caused by Taylor, who had a confrontation with Smitty inside the bar and who, therefore, had motive to injure Smitty, and who may have been lying about stomping and spitting on the body. Airwyke therefore argues that the jury convicted the wrong person. Contrary to Airwyke's argument, we do not agree that the jury lost its way.
 {¶ 64} The testimony of Taylor and Rosier, together with Airwyke's statement to the police, is consistent on the point that Airwyke struck Smitty hard enough to send him to the pavement. Airwyke suggests that Taylor must have struck Smitty, but there is no evidence to support this notion. Though the coroner testified to evidence of multiple *Page 15 
injuries on Smitty's body, he also testified that none of those injuries would have been fatal. In addition, there was no evidence that either Taylor or Airwyke caused such additional injuries. The jury chose to believe that it was the single punch thrown by Airwyke that caused Smitty to hit his head on the pavement, ultimately leading to his death. We choose not to second-guess the jury in its verdict in this regard.
 {¶ 65} The assignment of error is without merit.
 {¶ 66} Airwyke's fifth assignment of error is as follows:
 {¶ 67} "The trial court committed plain error by sentencing Appellant for crimes [for] which he was neither charged nor convicted."
 {¶ 68} Sentencing Order
 {¶ 69} The sentencing order of the trial court states that Airwyke was convicted of involuntary manslaughter under R.C. 2903.04(A) and assault under R.C. 2909.03(A)(1). The references to those sections were clerical errors. In fact, the record is clear that Airwyke was convicted of involuntary manslaughter under R.C. 2903.04(B) and assault under R.C.2903.13.
 {¶ 70} Crim.R. 36 that "[clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time." SeeState v. Cisternino (Mar. 30, 2001), 11th Dist. No. 99-L-137, 2001 Ohio App. LEXIS 1593, at *33-34.
 {¶ 71} Therefore, we are affirming Airwyke's convictions, but we reverse the trial court's sentencing order and remand this matter to the trial court for the sole purpose of amending its sentencing order by correcting the references to the Ohio Revised Code sections pursuant to which Airwyke was convicted. *Page 16 
 {¶ 72} The fifth assignment of error is with merit.
 {¶ 73} The judgment of the trial court is affirmed insofar as it pertains to Airwyke's convictions, but the judgment is reversed insofar as it contains clerical errors that need to be addressed by the trial court through an amended sentencing order. The matter is remanded for that purpose.
CYNTHIA WESTCOTT RICE, P.J., MARY DeGENARO, J., Seventh Appellate District, sitting by assignment, concur. *Page 1