[Cite as *State v. Tomlinson*, 2012-Ohio-1441.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 25924 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DARREN JEFFREY TOMLINSON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 10 08 2231 (A) |

DECISION AND JOURNAL ENTRY

Dated: March 30, 2012

WHITMORE, Presiding Judge.

{¶1} Defendant-Appellant, Darren Tomlinson, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} Officers from Akron's Street Narcotics Uniform Detail ("SNUD") gained intelligence from federal officials that a residence located at 1373 Gurley Circle contained both drugs and weapons. On the morning of August 6, 2010, SNUD officers began surveilling the residence. They observed two vehicles stop at the residence within a relatively short timeframe and ultimately conducted traffic stops on both vehicles once they left the area. The driver of the first vehicle was Symphone Smith. Because Smith had an outstanding warrant, the police arrested her. After arresting Smith and transporting her to jail in the police paddy wagon, the police discovered a discarded bag of crack cocaine in the paddy wagon as well as crack cocaine

crumbs on the seat where Smith had been sitting. The information that Smith had concealed crack cocaine was relayed to the officers surveilling the Gurley Circle residence.

{¶3} Meanwhile, officers stopped the second vehicle leaving the Gurley Circle residence and identified the driver as Smith's father. Not long after the second stop occurred, officers surveilling the residence observed an individual, later identified as Tomlinson, emerge from the residence carrying a large garbage bag. Tomlinson deposited the bag into a garbage can by the driveway. Believing that Tomlinson had received word that the police were nearby and was attempting to destroy evidence, SNUD officers immediately sought a warrant to search the residence.

{¶4} While a warrant was being obtained, Tomlinson and another individual left the Gurley Circle residence on foot and proceeded to walk down the street. Officers stopped Tomlinson and conducted a *Terry* frisk. Fearful that other individuals might still be in the residence and either destroy more evidence or present a safety issue, several officers gained entry to the residence and quickly swept the house for other individuals. Once officers confirmed that the house was empty, they awaited further instructions. A short period of time later, a warrant was obtained and a search ensued. The search uncovered multiple firearms as well as powder and crack cocaine. In particular, officers found two handguns, a sawed-off shotgun, and crack cocaine in the bag that Tomlinson placed in the garbage can outside the house. Tomlinson told the officers at the scene that the drugs were not his. He stated that he merely disposed of the items after receiving a phone call telling him to remove the drugs and firearms from the house.

{¶5} On August 19, 2010, a grand jury indicted Tomlinson on the following counts: (1) two counts of possessing cocaine, in violation of R.C. 2925.11(A)(C)(4); (2) two counts of trafficking in cocaine, in violation of R.C. 2925.03(A)(C)(4); (3) three counts of having weapons

while under disability, in violation of R.C. 2923.13(A)(3); and (4) possessing criminal tools, in violation of R.C. 2923.24.  All of the possession and trafficking counts also contained attendant forfeiture specifications, pursuant to R.C. 2941.1417.

{¶6}  On October 19, 2010, Tomlinson filed a motion to suppress, and the court held a two-day hearing on November 4, 2010 and January 19, 2011.  The court denied the motion to suppress on February 2, 2011.  A joint trial for Tomlinson and Smith commenced on March 21, 2011.  Thereafter, a jury found Tomlinson guilty on all counts with the exception of the two trafficking counts.  The trial court sentenced Tomlinson to a total of eleven years in prison.

{¶7}  Tomlinson now appeals from his convictions and raises five assignments of error for our review.  For ease of analysis, we rearrange several of the assignments of error.

II

Assignment of Error Number One

THE TRIAL COURT REPEATEDLY DENIED MR. TOMLINSON THE RIGHT TO CONFRONT AND CROSS-EXAMINE THE STATE'S WITNESSES, A FAIR TRIAL, AND DUE PROCESS OF LAW, IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTITUTION.

{¶8}  In his first assignment of error, Tomlinson argues that the trial court deprived him of his right to a fair trial by refusing to allow him to recross-examine several witnesses.  We disagree.

{¶9}  Evid.R. 611 instructs trial courts to "exercise reasonable control over the mode and order of interrogating witnesses * * *."  Evid.R. 611(A).  "Although a defendant must have the opportunity to cross-examine all witnesses against him as a matter of right, * * * the opportunity to recross-examine a witness is within the discretion of the trial court."  (Internal citations omitted.)  *State v. Faulkner*, 56 Ohio St.2d 42, 46 (1978).  An abuse of discretion means

that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "[W]here * * * no new matters are explored on redirect examination, it is not an abuse of discretion for the trial court to deny defense counsel's request to conduct a recross-examination." *Faulkner* at 46.

{¶10} Tomlinson argues that the court abused its discretion by refusing to allow him to recross-examine the following seven witnesses: Gerald Forney, Patricia Thorn, Joshua Barr, Nancy Mundy, Brian Nida, Joseph Danzy, and Brian Boss. Upon our review of the record, Tomlinson never asked the court to recross-examine Mundy, Danzy, or Boss. Tomlinson's brief indicates that his counsel objected to the trial court's refusal to allow him to recross-examine these witnesses, but the objections do not appear on the record. Although the transcript indicates that the court held at least one sidebar discussion with counsel, the discussion was not transcribed by the court reporter. *See State v. Kleinfeld*, 9th Dist. No. 24736, 2010-Ohio-1372, ¶ 7 ("Had [Appellant] preserved an objection at sidebar, it was her duty to provide this [C]ourt with a record on appeal to support her claim of error."). The trial court cannot be said to have abused its discretion by denying a request, if Tomlinson failed to make one. Because the record reflects that Tomlinson did not request to recross-examine Mundy, Danzy, and Boss, the trial court cannot be said to have denied him that opportunity. *See id.* We, therefore, limit our discussion to Tomlinson's request to recross-examine Forney, Thorn, Barr, and Nida.

Sergeant Gerald Forney

{¶11} Sergeant Forney testified that he began the initial surveillance on the Gurley Circle residence and remained with the investigation until officers ultimately completed the search there. Sergeant Forney gave approximate timeframes on direct examination with regard to the times at which: his surveillance commenced, the two vehicles were stopped, Tomlinson

discarded the trash bag, Tomlinson was stopped on foot, and the search took place. On cross-examination, Tomlinson's counsel heavily stressed the timeframe here and tried to create an exact timeline of the events. Counsel also repeatedly asked Sergeant Forney how he recorded the events that transpired. In particular, the following exchanges took place:

> [COUNSEL:] Did you provide a time line or a recording of times of your investigation throughout in any format?
>
> [SERGEANT FORNEY:] Not that I'm aware of.
>
> [COUNSEL:] Not in the affidavit for search warrant or any other method?
>
> [SERGEANT FORNEY:] Not that I'm aware of.
>
> * * *
>
> [COUNSEL:] * * * Are there any other time sequences provided in [the search warrant] or any other document that you have?
>
> [SERGEANT FORNEY:] Nothing probably that specific * * *.

Defense counsel also asked Sergeant Forney about the mobile data terminal in his vehicle and its ability to record the times of events. Specifically, defense counsel asked the following series of questions:

> [COUNSEL:] And [the mobile data terminal is] a timing device as well?
>
> [SERGEANT FORNEY:] Yes.
>
> [COUNSEL:] And every time you click on that, there is a time stamp put on that particular transaction. * * * For instance, * * * it would time stamp it at 11:45 if that's when the call went out; is that correct?
>
> [SERGEANT FORNEY:] Yes. If you were in a marked car, marked cars have those in there, [mobile data terminals].

Sergeant Forney went on to explain that the mobile data terminal only would record information relayed through dispatch and that, if he were only conducting surveillance and did not inform dispatch of a particular activity, the activity would not be recorded on the mobile data terminal.

{¶12} On redirect examination, the State asked Sergeant Forney if the times in his investigation were approximate and if he had ever generated "a minute-by-minute summary of this investigation." Sergeant Forney indicated that he had not and that he never recorded the timing of investigations with that degree of detail. He further indicated that the police do not commonly use their mobile data terminals as timing devices for purposes of recording their investigations.

{¶13} Tomlinson's defense counsel stated, in a proffer to the court, that if he had been permitted to recross-examine Sergeant Forney, he would have asked him about the times logged on incident reports. Defense counsel argued that the State brought up on redirect that there were no recorded times in the investigation. According to defense counsel, he would have pointed out that the prosecutor's statement and Sergeant Forney's answer were incorrect because incident reports contain time stamps.

{¶14} The State did not aver on redirect that there were no recorded times in Sergeant Forney's investigation. The prosecutor only asked Sergeant Forney whether he had a minute-by-minute log of the events that occurred, and Sergeant Forney testified that he did not. Moreover, the prosecutor's questions on redirect were asked to clarify the numerous questions defense counsel posed on cross-examination, in which he suggested that the investigation had been deficient because no exact timeline existed. The State's questions on redirect did not raise any new matters. The prosecutor simply pursued the line of questioning that defense counsel raised on cross-examination. Additionally, there was no impediment to defense counsel asking Sergeant Forney about the incident reports on cross-examination. He repeatedly asked whether any documents in any format existed to record the investigation times; questions that he could have followed up with the investigation report. Because the State did not raise any new material

and defense counsel largely covered the issue of timing on cross-examination, the trial court did not abuse its discretion by refusing to allow the recross-examination of Sergeant Forney. *See Faulkner*, 56 Ohio St.2d at 46.

Officer Patricia Thorn

{¶15} Officer Thorn testified that she drove the paddy wagon used to transfer Smith from the scene of her traffic stop to the jail and that she discovered the crack cocaine left in the paddy wagon. On direct examination, Officer Thorn testified that she routinely checks the wagon before each shift to ensure that it is free of any contraband and that she did so on the day in question. She further testified that after transporting Smith she observed a bag of cocaine shoved underneath the divider that separated Smith's compartment from the adjoining compartment in the wagon. She also observed crack cocaine crumbs on the seat where Smith had been sitting. Officer Thorn admitted that there was another passenger in the wagon for transport at the time she transported Smith. She testified, however, that the bag and crumbs of cocaine were not present in the wagon before she loaded Smith into her compartment.

{¶16} On cross-examination, Smith's counsel elicited testimony from Officer Thorn that Smith was handcuffed from behind when placed in the wagon. Officer Thorn also agreed that the confines of the wagon were cramped, such that it would have been difficult for anyone to stand upright. Smith's counsel drew attention to the fact that the pat down of Smith before her transport did not uncover any contraband and that there was another passenger in the wagon at the time of Smith's transport. Tomlinson's defense counsel cross-examined Officer Thorn as well, but once again focused his questioning on the timeline involved with her discovery of the cocaine and her conveyance of that information to the other officers who were surveilling the Gurley Circle residence.

{¶17} On redirect, the State again delved into the location of the bag of cocaine that Officer Thorn found. The prosecutor then asked Officer Thorn about the lighting conditions when she placed Smith into the wagon and whether Smith said anything to Officer Thorn about there being anything in her compartment. Officer Thorn testified without objection that it was daylight when she loaded Smith into the wagon and that Smith never indicated that she saw any foreign material in her compartment.

{¶18} After the trial court excused Officer Thorn, both defense counsels argued about the issue of recross-examination. Tomlinson's defense counsel argued that the State raised new material on redirect by asking whether Smith told Officer Thorn that she saw contraband in her wagon compartment. Tomlinson's defense counsel stated, in a proffer to the court, that if he had been permitted to recross-examine Officer Thorn, he would have asked her if "anybody else who saw things being shoved [in the compartment] * * * would have said oh, there are things being shoved through here by the other person * * *." It is not clear from the context of the proffer whether defense counsel wanted to ask whether the other passenger in the wagon said anything to Officer Thorn or whether, in her experience, other wagon passengers had ever informed her they observed contraband so as to disclaim its possession.

{¶19} Even assuming that the State raised new material on redirect and that the prosecutor's questions were not simply follow-ups to the issues raised by Smith's counsel on cross-examination, it is entirely unclear to this Court how Tomlinson was prejudiced by not being able to recross-examine Officer Thorn. Tomlinson was charged based on the firearms and cocaine that officers found at the residence on Gurley Circle, not the cocaine in the wagon. The cocaine in the wagon pertained to Smith, who was being tried jointly with Tomlinson. As to Tomlinson, the cocaine in the wagon only was relevant to the extent that it helped the police

develop probable cause for their later search of the Gurley Circle residence. Any challenge to probable cause would be a suppression issue, not an issue at trial. Additionally, Tomlinson has not offered any argument in his brief to this Court, explaining how he was prejudiced by the decision not to allow recross-examination. *See* App.R. 16(A)(7). The record does not support the conclusion that the trial court abused its discretion by not allowing Tomlinson's counsel to recross-examine Officer Thorn.

Joshua Barr

{¶20} Barr, a forensic scientist assigned to the firearm section at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified that he inspected the firearms the police recovered in this case. Specifically, he tested a Ruger 9mm, semi-automatic pistol; a Cobray 9mm, semi-automatic pistol; and a single-shot, sawed-off shotgun. Barr testified on direct examination that all three firearms were operable.

{¶21} On cross-examination, Tomlinson's defense counsel asked Barr numerous times about fingerprinting, the value of fingerprinting, and whether the firearms had been tested for fingerprints. Barr testified that no one requested that the firearms be fingerprinted, so BCI did not perform fingerprinting. Tomlinson's counsel also asked Barr about DNA evidence, the ability of BCI's facility to perform DNA testing, and the lack of a request for DNA testing on the firearms. Barr confirmed that BCI was capable of performing DNA testing, but that no such testing was performed because no one had requested it.

{¶22} On redirect, the State asked Barr whether he was a fingerprint or DNA expert and whether he had anything to do with fingerprinting or DNA testing at BCI. Barr responded in the negative to both questions. At that point, Tomlinson's counsel asked for recross-examination,

and the trial court denied the request. Tomlinson's counsel did not proffer any additional questions or otherwise indicate what he wished to ask Barr on recross-examination.

{¶23} Tomlinson argues on appeal that the court erred by denying him his request for recross-examination. Because the State did not raise any new material on redirect examination, however, the court was not required to permit recross-examination. *Faulkner*, 56 Ohio St.2d at 46. The State only asked Barr to clarify the responses he gave on cross-examination; a fact which Tomlinson does not challenge on appeal. As such, the trial court did not abuse its discretion by denying recross-examination.

Detective Brian Nida

{¶24} Detective Nida testified that he participated in the search of the Gurley Circle residence once the police obtained a warrant. On direct examination, the prosecutor asked Detective Nida about a butter knife that he found in a kitchen cupboard. Detective Nida testified that the butter knife had a white substance on it that tested presumptively positive for cocaine. Tomlinson's defense counsel pursued a line of questioning about the butter knife on cross-examination. In particular, defense counsel asked why the knife was significant and "[w]hat is the use of a knife like that in connection to crack cocaine?" Detective Nida responded that the knife drew his attention because of the white substance on it and that such knives are often used to chip out or cut up crack cocaine when it is made in a glass container.

{¶25} On redirect examination, the State continued on defense counsel's line of questioning and asked Detective Nida about the uses of such a knife as well as the process of crack cocaine manufacturing. Once Detective Nida explained the process, the prosecutor asked Detective Nida if he had found any of the items that were involved in that process in the Gurley

Circle residence. Detective Nida confirmed that there were glass containers in the residence as well as a Pyrex measuring cup and box of baking soda.

{¶26} After the trial court excused Detective Nida, defense counsel argued that the State introduced new material on redirect by inquiring about the glass Pyrex measuring cup. The trial court determined that the State's questions were follow-ups to the questions defense counsel asked on cross-examination and that it was defense counsel's choice to pursue that line of questioning. Consequently, the trial court did not permit recross-examination.

{¶27} Tomlinson argues on appeal that the trial court abused its discretion by not allowing him to recross-examine Detective Nida. His argument, however, only amounts to a generic assertion that the court's ruling deprived him of his right to a fair trial. He makes no attempt to explain why the trial court should have allowed him to recross-examine Detective Nida, in particular, or why the prosecutor's line of questioning amounted to new material rather than another aspect of the testimony his own counsel elicited on cross-examination. *See* App.R. 16(A)(7). Moreover, he did not make a proffer in the court below or otherwise indicate what additional line of questioning he would have pursued, had he been permitted to recross-examine Detective Nida. As this Court has repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. No. 18349, 1998 WL 224934, *8 (May 6, 1998). Therefore, we conclude that Tomlinson has not shown that the trial court abused its discretion by not allowing him to recross-examine Detective Nida.

{¶28} Based on all the foregoing, we conclude that Tomlinson's first assignment of error lacks merit. Accordingly, it is overruled.

Assignment of Error Number Two

THE TRIAL COURT ERRED IN DENYING TOMLINSON'S MOTION FOR A MISTRIAL, VIOLATING HIS RIGHT TO A FAIR AND IMPARTIAL TRIAL WHEN THE STATE'S WITNESS INTENTIONALLY ENGAGED IN MISCONDUCT BY TESTIFYING ABOUT EVIDENCE THE TRIAL COURT HAD PREVIOUSLY SUPPRESSED.

{¶29} In his second assignment of error, Tomlinson argues that the trial court erred by denying his motion for a mistrial. Specifically, Tomlinson argues the court should have granted a mistrial after one of the State's witnesses testified regarding an item that was allegedly suppressed before trial.

{¶30} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected. Great deference is afforded to a trial court's decision regarding a motion for mistrial. Accordingly, this Court reviews the denial of a motion for mistrial for an abuse of discretion." (Internal citations, alterations, and quotations omitted.) *State v. Howes*, 9th Dist. No. 24665, 2010-Ohio-421, ¶ 11. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore*, 5 Ohio St.3d at 219.

{¶31} Tomlinson moved for a mistrial after Detective Brian Boss gave the following testimony in response to his counsel's inquiry:

> [COUNSEL:] Did you determine that Mr. Tomlinson lived at 915 Peerless Avenue in Akron, Ohio?
>
> [DETECTIVE BOSS:] No. I determined that he lived at 1373 Gurley Circle because he had the key around his neck.

Upon Detective Boss' assertion that Tomlinson was wearing the key to the Gurley Circle residence at the time the police stopped him, Tomlinson's counsel asked to approach the bench. Tomlinson's counsel stated that it was his understanding that no evidence of the key to 1373

Gurley Circle was to be presented to the jury because the court granted his motion to suppress on the issue of the key. The trial court ultimately sustained Tomlinson's argument as an objection and instructed the jury to disregard the portion of Detective Boss' answer, referencing the key. The court denied the motion for mistrial, however, by concluding that the evidence of the key did not taint the remaining evidence so as to adversely affect Tomlinson's substantial rights.

{¶32} It would appear from our review of the record that there was a great deal of confusion in the trial court with regard to the court's suppression ruling. Tomlinson filed a motion to suppress on three separate grounds, seeking to suppress: the entry of the police into the Gurley Street residence, the stop of Tomlinson after he left the residence on foot, and the search warrant the police obtained to search the residence. After the police stopped Tomlinson, they found a key around his neck and tested it on the door of the Gurley Street residence. Because the key worked, the officers used it to gain entry into the home to perform their protective sweep rather than gaining entry by way of a battering ram. Tomlinson argued that there was no basis to confiscate the key during the *Terry* frisk of his person because it was not immediately apparent that it was contraband. As such, he asked the court to suppress the key.

{¶33} At the conclusion of the suppression hearing, the court orally denied the motion to suppress. The court specifically indicated that the key was allowed into evidence, depending on whether or not it became relevant. The court stated that it would do additional research about the taking of the key, but that research "doesn't affect my ruling here * * *." The court then journalized an entry on February 2, 2011, denying the motion to suppress. Inexplicably, at trial, both the parties and the court appeared to be under the impression that the court had granted some aspect of the suppression motion.

{¶34} Tomlinson argues that the court abused its discretion by refusing to grant a mistrial because the State's witness intentionally referenced suppressed evidence. Yet, based on the record before us, no evidence was suppressed. The court denied Tomlinson's motion to suppress both orally and in writing. As such, Detective Boss did not interject inadmissible evidence into his answer, and any mistrial on that basis would have been unjustified. The trial court did not err by denying the motion for a mistrial. Tomlinson's second assignment of error is overruled.

Assignment of Error Number Four

> THE TRIAL COURT COMMITTED PLAIN ERROR IN ALLOWING THE STATE TO PLAY AN ALLEGED INCRIMINATING JAIL TELEPHONE RECORDING OF THE CO-DEFENDANT SYMPHONE SMITH BECAUSE THE RECORDING WAS NEVER PROPERLY AUTHENTICATED AS REQUIRED BY OHIO RULES OF EVIDENCE 901(B)(5) IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶35} In his fourth assignment of error, Tomlinson argues that the trial court committed plain error when it admitted the unauthenticated recording of a jail telephone call, purportedly made by Smith.

{¶36} Evid.R. 901 provides that authentication or identification of a piece of evidence is a condition precedent to the admissibility of that evidence. Because Tomlinson did not object to the State's alleged failure to authenticate the recording at trial, his argument is limited to a claim of plain error. *Akron v. Stalnaker*, 9th Dist. No. 23617, 2007-Ohio-6789, ¶ 12. "Crim.R. 52(B) permits a reviewing court to take notice of '[p]lain errors or defects affecting substantial rights' even if a party forfeits an error by failing to object to the error at trial." *State v. Hardges*, 9th Dist. No. 24175, 2008-Ohio-5567, ¶ 9, quoting Crim.R. 52(B).

> First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error

> must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[ ]' [to the extent that it] * * * affected the outcome of the trial.

(Internal citation omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Courts are to notice plain error 'only to prevent a manifest miscarriage of justice.'" *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 16, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶37} The State played a recording of several telephone conversations from the Summit County Jail during the examination of Deputy Nancy Mundy, a Summit County Sheriff's Deputy. Deputy Mundy testified that one of her primary job functions is to deal with the inmate telephone calls placed from the jail. She explained that each inmate at the jail receives a unique PIN number associated with their social security number and that each call that an inmate makes is digitally recorded and stored according to their booking date, PIN number, and the date of the call. Deputy Mundy retrieved the digital recordings of telephone conversations labeled with Smith's unique PIN number. She testified that, to the best of her knowledge, the calls on the recording were made by Smith.

{¶38} In each recording, the caller identifies herself as "Symphone" at the beginning of the call. The telephone calls primarily concern Smith's own arrest and charges, but "Darren" is mentioned a handful of times. The caller refers to Tomlinson being in jail while telling the listener that the police raided her house and "got the guns and everything." The caller did not know why Tomlinson was in jail, but indicated at one point that Tomlinson received a phone call telling him to get out of the house.

{¶39} Tomlinson argues that the trial court committed plain error by admitting the recordings here because no one actually identified Smith as the caller on the recordings.

Tomlinson argues that the State was required to establish the caller was Smith, as through Evid.R. 901(B)(5). *See* Evid.R. 901(B)(5) (permitting a voice to be identified "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker").

{¶40} Tomlinson fails to offer any case law or argument, demonstrating that the evidence here was not "sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Deputy Mundy linked the digital recording to Smith by virtue of her unique PIN number. Further, the caller identified herself as "Symphone" in each of the calls and extensively discussed the police arresting her after finding cocaine in the paddy wagon and attributing it to her. Nothing in the record even remotely suggests that the caller on the recordings was not, in fact, Smith.

{¶41} Additionally, Officer Danzy testified that he spoke with Tomlinson while the police were performing their search of the Gurley Circle residence. Tomlinson told Officer Danzy that he had a relationship with Smith and spent many nights at the home. He denied that the drugs found at the residence belonged to him, but said that he received a phone call from someone "who told him to get that s*** out of there * * *." He admitted that he took the trash bag containing drugs and firearms outside and placed it in the garbage can. The jail recording the State played, therefore, merely corroborated the statements that Tomlinson himself made to Officer Danzy.

{¶42} Tomlinson has failed to demonstrate that the trial court committed plain error by admitting the recordings. Further, even assuming that court erred by admitting the recording in the absence of additional authentication testimony, the error was harmless in light of the admission of Tomlinson's statements to Officer Danzy. Tomlinson's fourth assignment of error is overruled.

Assignment of Error Number Three

THE TRIAL COURT ERRED IN ALTERING THE FORENSIC LABORATORY REPORT WITHOUT SOME TESTIMONY THAT THE ALTERATION WAS PROPER.

{¶43} In his third assignment of error, Tomlinson argues that the trial court erred by altering a lab report in the absence of any testimony that such an alteration would be proper.

{¶44} "A trial court possesses broad discretion with respect to the admission of evidence." *State v. Patel*, 9th Dist. No. 24030, 2008-Ohio-4693, ¶ 8. That broad discretion includes the discretion to redact materials or testimony introduced into evidence. *See, e.g., State v. Airwyke*, 11th Dist. No. 2006-T-0073, 2007-Ohio-3199, ¶ 17-18; *State v. Byrd*, 9th Dist. No. 03CA008230, 2003-Ohio-7168, ¶ 20-34; *State v. Andrews*, 10th Dist. No. 98AP-707, 1999 WL 394937, *6 (June 17, 1999). "This Court will not reverse the trial court's decision * * * to exclude relevant evidence absent an abuse of discretion." *Byrd* at ¶ 21. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore*, 5 Ohio St.3d at 219.

{¶45} At the close of the evidence, the parties stipulated to the admission of two laboratory reports from Michael Velton, a forensic scientist for BCI. The reports contained the results of the testing performed on the cocaine that the police recovered from the paddy wagon that transported Smith and from the Gurley Circle residence. The trial court instructed the jury that the parties had stipulated "to the findings listed in the reports of Michael Velton." Directly before jury deliberations commenced, the prosecutor raised an issue with the reports. Specifically, he informed the court that he noticed the reports listed subjects. The prosecutor stated that one report listed the subjects as "John Doe or Symphone Smith" and the other just listed "Symphone Smith." He then indicated that the jury might be confused because

Tomlinson's name was not on either report. Over objection from both defense counsels, the trial court agreed to redact the reports to avoid juror confusion. The court then redacted the subject portion of each report with white out so that no names were listed on them. At the time the trial court redacted the reports, they had yet to be published to the jury. Because the parties stipulated to the reports, the State never introduced them through a witness, and the redaction was made before the reports were given to the jury. Accordingly, the jurors were not aware that any redaction had occurred.

{¶46} Tomlinson argues that it was improper for the court to redact the reports as well as extremely prejudicial to his defense because the redaction "left * * * the jury to infer that the report applied to him without testimony to that effect." The record does not support Tomlinson's claim of prejudice, however, because the State connected the cocaine itself to Tomlinson through testimony. The reports only indicated the weight of the cocaine that the police recovered. There was testimony that the trash bag Tomlinson carried to the garbage can outside the Gurley Circle residence contained both crack and powder cocaine and the house contained "a hundred and some grams of cocaine." Moreover, Tomlinson admitted to Officer Danzy that he had knowledge of the drugs and attempted to dispose of them before the police arrived.

{¶47} Tomlinson has not pointed this Court to any law in support of his argument that the trial court lacked the authority to redact the subject portions of the lab reports upon its discretionary determination that those portions might be confusing to the jury. App.R. 16(A)(7). Even assuming that the court erred by altering the reports, however, Tomlinson has not shown that the court's redaction actually prejudiced his defense. In the absence of a well-reasoned argument to the contrary, we will not conclude that Tomlinson was prejudiced by the trial court's redaction of the reports here. Tomlinson's third assignment of error is overruled.

Assignment of Error Number Five

THE CUMULATIVE ERRORS COMMITED (sic) DURING TOMLINSON'S TRIAL RENDERED TOMLINSON'S TRIAL FUNDAMENTAL (sic) UNFAIR IN VIOLATION OF THE DUE PROCESS CLAUSE.

{¶48} In his fifth assignment of error, Tomlinson argues that cumulative errors in the proceeding deprived him of his right to a fair trial. We disagree.

{¶49} Cumulative error exists only where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "'[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508-509 (1983). Moreover, "errors cannot become prejudicial by sheer weight of numbers." *Hill* at 212.

{¶50} After reviewing the record, we cannot say that Tomlinson's trial was plagued with numerous errors or that his constitutional right to a fair trial was violated. Therefore, his fifth assignment of error is overruled.

III

{¶51} Tomlinson's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, J.
CONCURS IN JUDGMENT ONLY.

MOORE, J.
DISSENTING.

{¶52} I would sustain Tomlinson's third assignment of error regarding the redaction of the forensic laboratory report. As sustaining this assignment would require reversal, the remaining assignments of error would become moot.

{¶53} I agree that a trial court possesses broad discretion with respect to the admission and exclusion of evidence, including, in general, the discretion to redact documents. *See Airwyke* at ¶ 17-18, *Byrd* at ¶ 20-34, and *Andrews*, supra. However, unlike *Airwyke*, *Byrd*, and *Andrews*, the report at issue here was admitted on stipulation of the parties. It was not until just before jury deliberation that the State requested a redaction of the report.

{¶54} In *State v. Cundiff*, 5th Dist. No. 1997CA00391, 1998 WL 667032, the Fifth District reviewed a case involving the redaction of a medical report after it had been admitted

upon stipulation of the parties. There, the defendant was alleged to have assaulted a man. *Id.* at *1. The State and the defense stipulated as to the admission of the victim's medical records, and the records were admitted at the close of the State's case. *Id.* at *2. However, after closing arguments, the State requested the trial court remove a statement on a medical report which indicated that the victim had identified his attacker as "a 6'1" 190, 200 pound black male with whom he was not familiar," as it constituted inadmissible hearsay. *Id.* The defense objected to a redaction, but the trial court overruled the objection. *Id.* On appeal, the Fifth District confirmed the trial court's determination that the language in the report constituted hearsay and would normally be inadmissible, but reversed the trial court's judgment, holding as follows:

> [W]e hold a party cannot offer evidence, the admission of which the opposing party stipulates; allow the trial court to admit the evidence in its complete form; proceed with the case; and, after closing arguments, request the trial court to redact a portion of that evidence. By offering the complete medical records, we find the State waived its right to object to its own evidence and is estopped from altering that evidence after the close of the presentation of evidence. Accordingly, we find the trial court erred in redacting the medical records upon the State's request and over appellant's objection.

*Id.*

{¶55} I would agree with the Fifth District that a party is estopped from seeking redaction of its own evidence that has been previously admitted in its complete form upon stipulation of the opposing party. Applying this standard to similar pertinent facts in the present case, I would say that the trial court erred in redacting the subject line from the forensic report. Further, as part of Tomlinson's trial strategy appeared to attempt to shift focus onto Smith as the possessor of the recovered drugs, I cannot say this error was not prejudicial. *See* Crim.R. 52(A); *see also State v. Truitt*, 9th Dist. No., 25527, 2011-Ohio-6599, ¶ 25 ("In order to find harmless error in a criminal matter, a reviewing court must find that the error was harmless beyond a

reasonable doubt."). Accordingly, I would sustain Tomlinson's third assignment of error and reverse the judgment of the trial court.

APPEARANCES:

CEDRIC B. COLVIN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.